**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| WALGREEN CO., | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | No. 23 CV 17067 |
| | ) | |
| WALGREEN HEALTH SOLUTIONS, | ) | Judge Virginia M. Kendall |
| LCC and CHARLES R. WALGREEN, | ) | |
| | ) | |
| *Defendants.* | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This suit stems from use of the surname "Walgreen." Plaintiff Walgreen Co. brings claims against Defendant Walgreen Health Solutions, LLC ("WHS") for trademark infringement, trademark dilution, false representation or false designation of origin, and unfair competition. (Dkt. 1). In addition, Walgreen Co brings claims against both WHS and Defendant Charles R. Walgreen for unfair competition, and a claim against Mr. Walgreen alone for breach of contract. (*Id.*) The Defendants now move to dismiss all counts, arguing that Walgreen Co. fails to state claims for relief under Federal Rule of Civil Procedure 12(b)(6) and that the claims are time-barred. (Dkt. 33). For the following reasons, the motion to dismiss [33] is granted in part and denied in part.

## BACKGROUND

The Court takes the following facts from Walgreen Co.'s Complaint and treats them as true for the purposes of this motion. Walgreen Co. operates approximately 8,600 retail drug stores throughout the United States, including 550 in Illinois. (Dkt. 1 ¶ 14). Walgreen Co. also operates a nationwide online storefront. (*Id.*) Along with pharmacy services, Walgreen Co. sells health

1

products including "personal protective equipment (PPE), hand sanitizer, and durable medical equipment" such as compression socks, orthotics, supports, and braces. (*Id.* at ¶ 15).

Founded in 1901, Walgreen Co. has acquired fame for its high-quality standards, healthcare innovations, public health contributions, and dissemination of general healthcare advice and information. (*See id.* at ¶¶ 13, 19–22). Throughout its history, Walgreen Co. employed various names such as "Walgreen Co.," "Walgreen's," and "Walgreens." (*Id.* at ¶ 48). The Complaint alleges that Walgreen Co.'s reputation is associated with the name "Walgreens." (*Id.* at ¶ 23).

Walgreen Co. owns U.S. Trademark Registration No. 2096551 for the typed word mark WALGREENS®, registered September 16, 1997. (*Id.* at ¶ 24). The word mark covers a laundry list of health products including: "skin lotions, skin moisturizers, . . . inner soles, and hosiery." (*Id.*) Walgreen Co. alleges they made substantial investments in advertising and promotion to connect the wordmark with its reputation for innovation and high product standards. (*Id.* at ¶ 27). In fact, Walgreen Co. has used the WALGREENS® mark in conjunction with phrases such as "Walgreens Health" and "Walgreens Health Services." (*Id.* at ¶ 28). In 1999, Walgreen Co. registered the website walgreenshealth.com, which it still owns, and in 2005 the website's landing page read "Welcome to Walgreens Health Services." (*Id.*) Walgreen Co. also launched a business segment called "Walgreens Health" in 2021. (*Id.* at ¶ 29). Through its commercial successes and promotional materials, Walgreen Co. fostered "tremendous goodwill" and "great fame and reputation" surrounding the WALGREENS® mark. (*Id.* at ¶ 30).

Defendant Walgreen Health Solutions ("WHS") is an Illinois company trading in durable medical equipment, general healthcare advice and information, and other health products. (*Id.* at ¶ 33). Founded in 2018, WHS began conducting business in either 2019 or 2020, and is the

successor-in-interest to medical supply company DM Solutions Inc. (*Id.* at ¶ 39). Walgreen Co. and WHS have no current or previous affiliation. (*Id.* at ¶ 34).

Defendant Charles R. Walgreen is the President, CEO, and partial owner of WHS. (*Id.* at ¶ 53). WHS's Articles of Organization identify Mr. Walgreen as either a manager or having management authority over WHS. (*Id.* at ¶ 7). In addition to being a former 20-year employee of Walgreen Co., Mr. Walgreen is also the great-grandson of the founder of Walgreen Co. and the son of a former Walgreen Co. CEO. (*Id.* at ¶ 53).

WHS solely operates online storefronts at walgreenhealthsolutions.com, walgreenhealthsolutionsproducts.com, and on Amazon Marketplace. (*Id.* at ¶ 35). WHS targets healthcare providers and retail consumers who can order products directly from WHS's websites or Amazon store. (*Id.* at ¶ 44). WHS's online products include lotions, cushioned boots, tension straps, compression stockings, elbow suspension pads, and PPE. (*Id.* at ¶¶ 40–41). For a time, WHS sold "Walgreen Health Solutions"-branded hand sanitizer and facemasks. (*Id.* at ¶ 42). Further, WHS promotes its goods and services in conjunction with general health advice on its social media accounts @WalgreenHealth on X and "Walgreen Health Solutions" on Facebook. (*Id.* at ¶¶ 35, 45–46).

The Complaint alleges that on its websites, the WHS's logo emphasizes the surname "Walgreen" by differentiating its color, shape, and font from the subsequent "Health Solutions" phrase.



(*Id.* at ¶ 36). On social media—such as LinkedIn, YouTube, Facebook, and X—WHS shortens its logo to display only the "Walgreen" surname.



(*Id.* at ¶ 37). On Amazon, WHS's products do not show a logo but identify the seller with the typed characters "Walgreen Health Solutions." (*Id.* at ¶ 38).

Walgreen Co. alleges that WHS and Mr. Walgreen are intentionally using Walgreen Co.'s "goodwill, equity, and fame" when using the Walgreen name without license or consent. (*Id.* at ¶ 64). They state that under information or belief, Mr. Walgreen, or others under his direction, formed WHS, named the company, and registered the company's domain names with the intention of confusing consumers into believing the companies were associated. (*Id.* at ¶¶ 54–55). Primarily contributing to consumers' confusion, WHS sells similar products to Walgreen Co. For example, Walgreen Co. sold sleeves, supports, stockings, orthotics, lotions, and PPE—all products that WHS sells—online and in-store years before WHS's founding. (*Id.* at ¶ 47). Additionally, social media users have directed posts to WHS that reference Walgreen Co.'s services. (*See id.* at ¶¶ 50–51). Walgreen Co. states that this confusion has diminished their standard for quality standard, goodwill, and brand equity. (*See id.* at ¶¶ 3, 52).

This is not the first dispute between these parties. In 2012, two companies affiliated with Mr. Walgreen began selling "iWag" branded cellphone accessories, which Walgreen Co. considered a violation of its trademark rights. (*Id.* at ¶¶ 56–57, 59). In 2013, the parties reached an agreement (the "2013 Agreement") regarding the "iWag" mark. (Dkt. 1-2). Mr. Walgreen, agreed

that he "neither individually or on behalf of any entity not a party to this agreement, will take any action which conflicts with the obligations of the Companies herein." (Dkt. 1-2 at 4). The obligations in the 2013 Agreement include, in pertinent part, that "[t]he Companies, together with their officers and agents, will take reasonable precautions to insure [sic] their businesses are not confused with Walgreen Co . . . " and "[t]he Companies, together with their agents, . . . will not register any additional domains that are likely to be confused with domain names owned or used by Walgreen Co." (Dkt. 1-2 at 3). The 2013 Agreement defines the "Companies" as American Health and Wellness, LLC d/b/a iWag and Walgreen Asset Group, Inc. (Dkt. 1-2 at 2).

On or around March 2, 2022, shortly after learning about and investigating WHS, Walgreen Co. sent a letter to WHS expressing its view that WHS and Mr. Walgreen committed trademark infringement and were in violation of the 2013 Agreement. (*Id.* at ¶ 62). The parties engaged in unfruitful efforts to settle matters out of court from March 2022 until December 12, 2023, when Walgreen Co. filed this complaint. (*Id.* at ¶ 63).

Now, Walgreen Co. brings claims against WHS for trademark infringement under 15 U.S.C. § 1114 (Count I); trademark dilution under 15 U.S.C. § 1125(c) (Count II); false designation of origin and/or false representation under 15 U.S.C. § 1125(a) (Count III); Illinois trademark infringement under 765 ICS 1036/60 (Count IV); violation of Illinois Uniform Deceptive Trade Practices Act ("IDPTA") under 815 ILCS 510 (Count V); and common law unfair competition against both WHS and Mr. Walgreen (Count VI). (Dkt. 1 at ¶¶ 65–106). Finally, Walgreen Co. alleges breach of contract against Mr. Walgreen for violation of the 2013 Agreement (Count VII). (*Id.* at ¶¶ 102–06). Among other forms of relief, Walgreen Co. seeks money damages, a permanent injunction restraining Mr. Walgreen and WHS from infringing upon the WALGREENS® mark, and judgment directing WHS to deliver for destruction all articles bearing, and all means of making

5

or promoting the "Walgreen" or "Walgreen Health Solutions" marks. (*Id.* at 25). Mr. Walgreen and WHS now move to dismiss the Complaint for failure to state a claim. (Dkt. 33).

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[A] plaintiff must allege 'enough facts to state a claim that is plausible on its face.' " *Allen v. Brown Advisory, LLC*, 41 F.4th 843, 850 (7th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009)). The Court accepts the well-pleaded factual allegations in the plaintiff's complaint as true, "drawing all reasonable inferences in his favor." *Id.* (citing *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016)). Yet, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not enough. *Oakland Police & Fire Ret. Sys. v. Mayer Brown, LLP*, 861 F.3d 644, 649 (7th Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678). For claims sounding in fraud, Federal Rule of Civil Procedure 9(b) requires plaintiffs to "state with particularly the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Thus, a plaintiff must "describe the 'who, what, when, where, and how' of the fraud—'the first paragraph of any newspaper story.'" *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009)). The Court "also consider[s] any documents attached to and integral to the complaint as part of the [plaintiff's] allegations." *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 878 (7th Cir. 2022).

## DISCUSSION

In their motion, Defendants WHS and Mr. Walgreen argue that Walgreen Co. pled insufficient facts to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6). Alternatively, WHS and Mr. Walgreen argue that the claims are time-barred.

### I.   Lanham Act Claims (Counts I, III, IV, V, and VI)

Initially, Walgreen Co. alleges that WHS's marks constitute trademark infringement under the Lanham Act, 15 U.S.C. § 1114 (Count I), the Illinois trademark statute, 765 ILCS 1036/60 (Count IV), and false designation of origin and/or false representation, 15 U.S.C. § 1125(a) (Count III). Likewise, Walgreen Co. claims WHS's marks constitute unfair competition under the IDPTA, 815 ILCS 510 (Count V), and Illinois common law (Count VI). The parties agree that the Lanham Act analysis also controls the IDPTA, Illinois trademark, and common law claims. (*See* Dkt. 33 at 12–13; Dkt. 37 at 13–14). Moreover, as the trademark infringement and unfair competition claims all arise from the same conduct, WHS's arguments attack all five claims. Accordingly, the Court analyzes these claims together. *See, e.g.*, *Mechling v. Operator of Website Muaythaifactory.com*, at *3 (N.D. Ill. Sept. 1, 2021) ("The same two-factor analysis [in a Lanham Act trademark infringement suit] applies to claims for false designation of origin."); *Mighty Deer Lick, Inc. v. Morton Salt, Inc.*, 2020 WL 635904 at *6 (N.D. Ill. Feb. 11, 2020) (analyzing Lanham Act, Illinois trademark, and common law unfair competition claims together); *La Zaza Trattoria, Inc. v. Lo Bue*, 2012 WL 3308846 at *3 (N.D. Ill. Aug. 10, 2012) ("Claims for unfair competition and deceptive business practices brought under Illinois statutes are to be resolved according to the principles set forth under the Lanham Act." (quoting *Morningware, Inc. v. Hearthware Home Prods., Inc.*, 673 F.Supp.2d 630, 639 (N.D. Ill. 2009))). Further, Lanham Act claims charge a form of fraud and are therefore subject to heightened standards of particularity. *See Gensler v. Strabala*, 764 F.3d 735,

737 (7th Cir. 2014); Fed. R. Civ. P. 9(b); *see also Oil-Dri Corp. of Am. v. Nestlé Purina Petcare Company*, 2017 WL 1436965 (N.D. Ill. Apr. 24, 2017); *Kunes Country Auto. Mgmt. Inc. v. Walters*, 2024 WL 2114006, at *8 (E.D. Wis. May 10, 2024).

To state a claim for trademark infringement under the Lanham Act, a plaintiff must allege that (1) its mark is protectable, and (2) the defendant's use of the trademark is likely to cause confusion among consumers. *See SportFuel, Inc. v. PepsiCo, Inc.*, 932 F.3d 589, 595 (7th Cir. 2019); 15 U.S.C. § 1114. Registration of a mark with the U.S. Patent and Trademark Office ("USPTO") creates a rebuttable presumption of validity. *See* 15 U.S.C. § 1057(b) (noting "registration of a mark . . . shall be prima facie evidence of the validity of the registered mark"); *Georgia–Pac. Consumer Prods. LP v. Kimberly–Clark Corp.*, 647 F.3d 723, 727 (7th Cir. 2011).

### a. Protectability of Walgreen Co.'s Mark

As Walgreen's Co. alleged that their mark is registered with the USPTO, they created a rebuttable presumption of validity. (Dkt 1 ¶¶ 24–25); 15 U.S.C. § 1057(b). Even so, WHS contends that Mr. Walgreen has a right, notwithstanding Walgreen Co.'s trademark, to use his surname in conjunction with his business. (Dkt. 33 at 6–7). The "personal-name rule," as it is sometimes called, is a common law rather than statutory doctrine. *Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 990 (7th Cir. 2004). As courts are "reluctan[t] to forbid a person to use his own name in his business," a mark that is "primarily merely a surname" is not registrable in the absence of secondary meaning. *Id.* (quoting 15 U.S.C. §§ 1052(e)(4)).

Thus, Walgreen Co. must plead facts to show that the public came to associate the name "Walgreen" uniquely with Walgreen Co. *See Joshi v. Joshi*, 2019 WL 3554388, at *4 (N.D. Ill. Aug. 1, 2019). Secondary meaning attaches to a mark "when it has been used so long and so exclusively by one company in association with its goods and services that the word or phrase has

8

come to mean that those goods or services are the company's trademark." *Packman v. Chi. Tribune Co.*, 267 F.3d 628, 641 (7th Cir. 2001). A court may consider several factors to establish secondary meaning, including "(1) the amount and manner of advertising; (2) the sales volume; (3) the length and manner of use; (4) consumer testimony; and (5) consumer surveys." *Reverse Mortgage Solutions*, 2015 WL 9478214, at *3 (N.D. Ill. Dec. 29, 2015) (citing *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1085 (7th Cir. 1988)). Beyond the presumptive validity granted by the WALGREENS® mark's USPTO registration, Walgreen Co. alleged facts that support the plausibility of finding a secondary meaning attached to the WALGREENS® wordmark. Therefore, Walgreen Co. sufficiently alleged that their trademark is protectable.

First, Walgreen Co. alleged facts that plausibly support a finding of lengthy and consistent manner of use of the WALGREENS® mark. Walgreen Co. first registered the wordmark in 1997 and has used it for more than a century. (Dkt. 1 at ¶¶ 24, 26). Walgreen Co. even alleges that it has specifically used the mark in conjunction with the terms "Health" and "Health Services," as early as 1999. (*Id.* at ¶ 28). Second, Walgreen Co. alleged facts supporting a high sales volume. The company notes it "fills millions of prescriptions in the United States every day" and has 8,600 nationwide locations. (*Id.* at ¶¶ 14, 15). Finally, Walgreen Co. stated their considerable and consistent advertising expenditures. Over the century in which Walgreen Co. has used and promoted the wordmark, they made substantial investments in promoting and advertising the mark. (*See id.* at ¶¶ 26, 27). In fact, the wordmark is the name of the company itself. As such, Walgreen Co. pled facts sufficient to support that, through their use of the mark, the Walgreen surname has acquired a secondary meaning and is protectable under the Lanham Act. Accordingly, the Court proceeds with the likelihood of confusion analysis.

b. **Likelihood of Confusion**

The Court weighs seven factors to determine if likelihood of confusion exists: "(1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any evidence of actual confusion; and (7) the intent of the defendant to 'palm off' his product as that of another." *Sorensen v. WD-40 Co.*, 792 F.3d 712, 726 (7th Cir. 2015) (citing *Bd. of Regents of Univ. of Wis. Sys. v. Phx. Int'l Software, Inc.*, 653 F.3d 448, 454 (7th Cir. 2011)). No single factor is dispositive, and courts may weigh each factor depending on the facts presented. *Packman*, 267 F.3d at 642. The "similarity of the marks, the defendant's intent, and actual confusion" are especially important. *Id.* Further, as likelihood of confusion is a fact-intensive analysis, it "ordinarily does not lend itself to a motion to dismiss." *Slep-Tone Entm't Corp. v. Coyne*, 41 F. Supp. 3d 707, 715 (N.D. Ill. 2014) (citation omitted). Thus, this Court "need only determine whether Plaintiff pled facts which could plausibly result in finding likelihood of confusion." *Wang v. P'ships & Unincorporated Associateions [sic] Identified on Schedule "A"*, 2022 WL 2463043, at *3 (N.D. Ill. July 6, 2022); *see also Slep-Tone*, 41 F. Supp. 3d at 715. Here, Walgreen Co. met this more lenient standard.

### i. The Similarity of the Marks

First, the Court considers the marks as a whole "in light of what happens in the marketplace and not merely by looking at the two marks side-by-side." *Sorensen*, 792 F.3d at 726 (quoting *AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008)). "The test is not whether the public would confuse the *marks*, but whether the viewer of an accused mark would be likely to associate the product or service with which it is connected with the source of products or services with which an earlier mark is connected." *Id.* (emphasis in original). The Court "consider[s] whether the

customer would believe that the trademark owner sponsored, endorsed, or was otherwise affiliated with the product." *Id.*

WHS primarily argues its mark differs from Walgreen Co.'s because WHS's mark uses the singular version of Mr. Walgreen's surname with the added words "Health Solutions." (Dkt. 33 at 7). This argument misses the mark: The test is not whether the two marks *read* identically, but "whether the viewer of an accused mark would be likely to associate the product or service with which it is connected with the source of products or services with which an earlier mark is connected." *Sorensen*, 792 F.3d at 726 (citation omitted). The Court already found that Walgreen Co. alleged facts supporting that the WALGREENS® mark has acquired a secondary meaning within the healthcare services and health products market. Likewise, Walgreen Co. previously used the wordmark in conjunction with the phrases "Health" and "Health Services." Walgreen Co. is a major player in the health products and services industry; it is not necessary for its mark to contain words such as "Health Solutions" for a viewer to plausibly perceive its products are associated with WHS. While the marks may not be identical in appearance, Walgreen Co. pled sufficient facts to support the plausibility of finding the marks are similar in suggestion.

### ii. The Similarity of the Products

When assessing the similarity of the products, the Court considers "not whether the products are interchangeable, but whether the products are the kind the public might very well attribute to a single source." *Sorensen*, 792 F.3d at 728–29 (citation omitted). This factor recognizes the importance of "protect[ing] the owner's ability to enter product markets in which it does not now trade but into which it might reasonably be expected to expand in the future." *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 681 (7th Cir. 2001) (citing *Sands, Taylor & Wood Co.*

*v. Quaker Oats Co.*, 978 F.2d 947, 958 (7th Cir. 1992)). This allows the owner to "capitaliz[e] on the good will associated with its mark by moving into new markets." *Id.*

Here, Walgreen Co.'s Complaint alleges both companies sell products that are sufficiently similar to satisfy this factor. First, Walgreen Co. notes that both companies sell health products such as lotions, compression socks, and orthotics. Likewise, in the recent past, both companies sold PPE and hand sanitizer. Even so, WHS argues that Walgreen Co.'s core business is over-the-counter consumer health products and accuses Walgreen Co. of attempting to enter their existing healthcare services market to push out WHS. (Dkt. 33 at 4, 11). Regardless, as Walgreen Co. pled facts to establish it is a major player in the healthcare products industry, it is reasonable to infer it would expand into the healthcare services industry in the future. *See CAE*, 267 F.3d at 681 (noting the Lanham Act "protect[s] the [trademark] owner's ability to enter product markets in which it does not now trade but into which it might reasonably be expected to expand in the future"). As such, the Complaint alleges sufficient facts to support finding this factor in Walgreen Co.'s favor.

### iii.   The Area and Manner of Concurrent Use

In analyzing the third factor, courts analyze "whether there is a relationship in use, promotion, distribution or sales between the goods or services of the parties." *CAE*, 267 F.3d at 681. Courts also assess "whether the parties use the same channels of commerce, target the same general audience, or use similar marketing procedures." *Sorensen*, 792 F.3d at 730. Here, Walgreen Co. alleged sufficient facts to support the plausibility of finding the parties' trademarks operate in concurrent areas and manners of use.

WHS argues that its target market channel and audience are online, direct-to-consumer products for physicians and hospitals, not retail customers like Walgreen Co. (Dkt. 33 at 11). Nevertheless, both companies operate online storefronts trading in healthcare goods. (Dkt. 1 ¶¶ 14,

35, 41, 47). While WHS's argues that their target audience is healthcare professionals, anyone may purchase products from WHS's websites. (*Id.* at ¶ 44). Similarly, both companies promote their goods and services in conjunction with health information and advice. (*Id.* at ¶¶ 22, 27, 45–46, 49). In fact, Walgreen Co. notes that it has repeatedly used the WALGREENS® mark in conjunction with "Health" and "Health Services." These facts support Walgreen Co.'s contention that WHS also targets the general consumer market for healthcare products. Taken together, these facts are sufficient to support a plausible finding that the companies use their marks in concurrent areas and manners of use.

### iv.  The Strength of the WALGREENS® Mark

Next, a trademark's strength "refers to the mark's distinctiveness, meaning its propensity to identify the products or services sold as emanating from a particular source." *CAE*, 267 F.3d at 684. Thus, "[t]he stronger the mark, the more likely it is that encroachment on it will produce confusion." *AutoZone*, 543 F.3d at 933. In fact, "a mark's strength ordinarily corresponds to its economic and marketing strength." *Id.*

Here, Walgreen Co. has employed the WALGREENS® wordmark for more than a century. During that time, the WALGREENS® mark obtained notoriety for philanthropy, innovation, and public service. (*See* Dkt. 1 ¶¶ 19–21). Beyond notoriety, Walgreen Co. operates 8,600 stores in the United States, suggesting considerable economic strength and everyday visibility. As such, Walgreen Co. alleged facts sufficient to support the reasonable inference (and common sense conclusion) that the WALGREENS® mark is strong and distinctive.

### v.  Evidence of Actual Confusion

Lastly, evidence of actual confusion, if available, is entitled to substantial weight; however, it is not required in the likelihood of confusion analysis at this stage. *See, e.g.*, *CAE*, 267 F.3d at

685. Walgreen Co. alleged two specific circumstances that support a finding of actual confusion in the marketplace. They provide two separate occasions where Walgreen Co.'s customers directed social media posts to WHS that the customers intended for Walgreen Co. (*See* Dkt. 1 ¶¶ 50–51). At this stage, the Court must draw all reasonable inferences in favor of Walgreen Co. and take the facts as true. Bearing this in mind, Walgreen Co.'s stated facts of actual confusion pass muster.

Ultimately, Walgreen Co. alleged sufficient facts to support at least five of seven factors of likelihood of confusion in their favor. Accordingly, the Court finds the Complaint survives under the Lanham Act trademark infringement analysis. The motion to dismiss is thus denied with respect to Counts I, III, IV, V, and VI.

## II. Trademark Dilution Claim (Count II)

To state a claim for trademark dilution under the Lanham Act, a plaintiff must allege (1) its mark is famous, (2) the defendant adopted its mark after the plaintiff's mark became famous, (3) the defendant's use of its mark "causes dilution" of the plaintiff's famous mark, and (4) the defendant's use of its mark is commercial and in commerce. *See Eli Lilly.*, 233 F.3d at 466; 15 U.S.C. § 1125(c). There are two forms of dilution: "tarnishing, in which the similarity of marks causes consumers mistakenly to associate the plaintiff's famous mark with the defendant's inferior one, and blurring, in which seeing the plaintiff's mark used on many goods means it no longer serves as a unique identifier of the plaintiff's products." *Mighty Deer Lick*, 2020 WL 635904, at *7 (citing *Eli Lilly*, 233 F.3d at 466).

First, only "famous" marks are protected from dilution. *See Manley v. Boat/U.S., Inc.*, 75 F. Supp. 3d 848, 857 (N.D. Ill. 2014); *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1372 (Fed. Cir. 2012). A mark is "famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."

14

15 U.S.C. § 1125(c)(2)(A). Though dilution by fame is a rigorous standard, at this stage, Walgreen Co. alleges facts sufficient to state that its mark is diluted by either theory, as it one of those "well-known" marks "widely recognized by the general consuming public." *See Joshi*, at \*5 (collecting cases); *Coach Servs., Inc.*, 668 F.3d at 1372.

Here, Walgreen Co. repeatedly references the WALGREENS® mark's longstanding fame. (*See* Dkt. 1 ¶¶ 2, 23, 26–28, 30–31, 73). Walgreen Co. invested heavily in promotion and advertising its mark over the last century. The WALGREENS® mark is also highly visible, standing on the front of over 8,600 storefronts nationwide. Moreover, the WALGREENS® mark became famous long before WHS existed as an organization in 2018.

Finally, WHS uses its mark commercially in conjunction with its sales of similar products to Walgreen Co., such as durable medical equipment, hand sanitizer, and PPE, among other products. And on two separate occasions, Walgreen Co. customers who attempted to reach Walgreen Co. contacted WHS instead. Together, these facts support an inference that WHS's mark impairs the ability of the WALGREENS® mark to serve as a unique identifier for their goods and services or causes consumers mistakenly to associate the plaintiff's famous mark with the defendant's inferior one, thus diluting the trademark. Though dilution remains a fact-intensive inquiry, at this stage, the Court finds Walgreen Co. alleged sufficient facts to support the claim.

### III.  Breach of Contract Claim (Count VII)

Next, to state a claim for breach of contract under Illinois Law, the plaintiff must allege: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *Mighty Deer Lick*, 2020 WL 635904, at \*2 (quoting *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010)). As Walgreen

Co.'s Complaint fails to allege information sufficient to infer that Mr. Walgreen breached the 2013 Agreement, this claim dismissed.

Walgreen Co. contends that Mr. Walgreen violated the 2013 Agreement provision that "the Companies, together with their officers and agents, will take reasonable precautions to insure[sic] their businesses are not confused with Walgreen Co.[.]" (Dkt. 1 ¶ 60; Dkt. 1-2 at 3). Importantly, the 2013 Agreement defines the "Companies" as "American Health and Wellness, LLC d/b/a iWag and Walgreen Asset Group, Inc." (Dkt. 1-2 at 2). Walgreen Co. argues that, since Mr. Walgreen signed the 2013 Agreement, both individually and "on behalf of any entity not a party to this agreement," his alleged conduct regarding WHS violates the 2013 Agreement by creating a possibility of confusion between Walgreen Co. and WHS. Yet, where Mr. Walgreen signed in his individual capacity, the agreement provides that he will not "take any action which conflicts with the obligations of the Companies herein." (Dkt. 1-2 at 4). Neither one of the "Companies" specified in the 2013 Agreement is a party to this litigation. Therefore, based on the facts currently before the Court, the obligation set forth in the 2013 Agreement concerns the Companies—American Health and Wellness, LLC and Walgreen Asset Group, Inc.—and Walgreen Co. While Mr. Walgreen's alleged conduct may create a possibility of confusion between WHS and Walgreen Co., that conduct does not contribute to a likelihood of confusion between the Companies specified in the 2013 Agreement and Walgreen Co. As such, Walgreen Co. failed to allege sufficient facts to infer that Mr. Walgreen breached the 2013 Agreement, compelling Count VII's dismissal.[1]

---

[1] WHS also argues that the 2013 Agreement was for the sale of goods and thus governed by the Uniform Commercial Code's four year statute of limitations. (Dkt. 39 at 10); 810 ILCS 5/2-725(1). As the Court found the breach of contract claim fails to state that WHS was a party to the Agreement, the Court does not analyze this argument.

## IV.  Laches

Finally, Mr. Walgreen and WHS contend that Walgreen Co.'s claims are time-barred. (Dkt. 33 at 12–13). They argue that the doctrine of laches makes the three-year statute of limitations in the IDPTA applicable to Lanham Act claims, state unfair competition, and state trademark infringement claims. *Id*.

The equitable doctrine of laches derives from "the maxim that those who sleep on their rights, lose them." *Chattanoga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 792 (7th Cir. 2002). The doctrine requires the plaintiff must "(1) know of the infringing use of the service mark by the defendant, (2) exercise an inexcusable delay in bringing the lawsuit and (3) the Defendant must be unduly prejudiced as a result." *La Zaza*, 2012 WL 3308846, at *4 (citing *Chattanoga*, 301 F.3d at 792–93). A plaintiff need not anticipate affirmative defenses, such as laches, in its complaint. *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005). A plaintiff may, however, "'plead itself out of court" by setting forth everything necessary to satisfy the affirmative defense. *Id*. Thus, at the motion to dismiss stage, the Court's review is limited to the complaint; factual assertions outside the complaint are excluded. *See La Zaza*, 2012 WL 3308846, at *4 (citing *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1430 (7th Cir. 1996)).

As the Lanham Act does not specify a statute of limitations, federal courts rely on "analogous state statute of limitations to determine whether a presumption of laches should apply." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 821 (7th Cir. 1999). Here, the Seventh Circuit applies the three-year statute of limitations found in the IDPTA. *Chattanoga*, 301 F.3d at 793–94.

Ultimately, Walgreen Co.'s Complaint does not establish the elements of laches such that they have pled themselves out of court. WHS contends that the statute of limitations began tolling with the beginning of their business operations in either 2019 or 2020. (Dkt. 33 at 12). When WHS

began operating is irrelevant; WHS must show that Walgreen Co. knew of the allegedly infringing use of the mark and inexcusably delayed in taking action. *See Chattanoga*, 301 F.3d at 792–93. The Complaint only indicates that Walgreen Co. initiated attempts to settle matters out of court "shortly after" the plaintiffs learned of the alleged infringement in 2022. (Dkt. 1 ¶ 62). When exactly Walgreen Co. knew of the allegedly infringing use—or if a delay was inexcusable—is unclear and plausibly within the relevant statute of limitations. Thus, the Complaint does not fail on this ground.

## CONCLUSION

For the foregoing reasons, the Defendants' motion to dismiss [33] is granted in part and denied in part. Count VII is dismissed without prejudice, and Counts I, II, III, IV, V, and VI stand.


Virginia M.  Kendall
United States District Judge

Date: September 24, 2024