**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| WALGREEN CO., | |
| Plaintiff, | Civil Action No. 1:23-cv-17067 |
| vs. | |
| WALGREEN HEALTH SOLUTIONS, LLC and CHARLES R. WALGREEN, | Hon. Virginia M. Kendall |
| Defendants. | Hon. M. David Weisman |
| | **JURY TRIAL DEMANDED** |

<u>**AMENDED COMPLAINT**</u>

Plaintiff Walgreen Co. ("Walgreens" or the "Company"), for its complaint and prayer for injunctive relief against Walgreen Health Solutions, LLC ("Walgreen Health Solutions") and Charles R. Walgreen, states as follows:

<u>**INTRODUCTION**</u>

1.      Walgreens is one of the most prominent, trusted companies in the United States for health and wellness products. Walgreens built its valuable business reputation over many decades of offering high-quality goods and services, innovating to improve the customer experience, and serving the communities of which Walgreens is a part.

2.      Walgreens's reputation is one of its most valuable assets, and it is closely associated with the Company's trademarks—the words and symbols that let consumers know that the products and services they are buying come from the company they have come to know and trust. And among the most recognized of those trademarks is the WALGREENS® word mark, *i.e.*, the name of the company itself.

3.     Without Walgreens's license or consent, Defendants Walgreen Health Solutions and Charles R. Walgreen seek to exploit the goodwill Walgreens has built by using marks that are confusingly similar to the WALGREENS® word mark while selling products that are identical or similar to those Walgreens sells, but, on information and belief, without the same level of quality-control processes and protections for consumers who have come to trust "Walgreens"-branded health and wellness products.

4.     As explained below, Defendants have willfully and deliberately infringed and diluted the WALGREENS® mark and engaged in unfair competition, among other unlawful activities under federal and state law. Walgreens seeks, among other forms of relief, injunctive relief enjoining Defendants from ever again using the WALGREENS® mark, enhanced damages, and attorney's fees.

## PARTIES

5.     Walgreens is an Illinois company with its principal place of business at 108 Wilmot Road, Deerfield, IL 60015. Walgreens is a wholly-owned subsidiary of Walgreens Boots Alliance, Inc., a publicly-held corporation also based in Deerfield.

6.     On information and belief, Walgreen Health Solutions is an Illinois Limited Liability Company with its principal place of business at 1316 Sherman Avenue, Evanston, IL 60201. According to the records of the Office of the Illinois Secretary of State, the Registered Agent for the company is RRS Consulting, Ltd., and the Registered Office Address is 3 Hawthorn Parkway, Suite 200, Vernon Hills, IL 60061.

7.     On information and belief, Charles R. Walgreen is the President and CEO of Walgreen Health Solutions, and resides within the Northern District of Illinois. Mr. Walgreen is also identified in Walgreen Health Solutions's Articles of Organization as one of the managers

and/or members having the authority of manager for Walgreen Health Solutions, and the address for Mr. Walgreen provided in those Articles of Organization is 736 N. Western Ave, Suite 314, Lake Forest, IL 60045.

## JURISDICTION AND VENUE

8.      The Court has subject matter jurisdiction over Walgreens's federal claims pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338. Subject matter jurisdiction over Walgreens's related state-law claims is proper pursuant to 28 U.S.C. §§ 1338, 1367.

9.      The Court has personal jurisdiction over Walgreen Health Solutions because it is a domestic Illinois Limited Liability Company with one or more members who reside in (and are citizens of) Illinois, because Walgreen Health Solutions's principal place of business is in Illinois, and because Walgreen Health Solutions regularly conducts business in the state.

10.     The Court has personal jurisdiction over Mr. Walgreen because, on information and belief, he resides and works in Illinois and, separately, he conducted the acts alleged in this Complaint in Illinois.

11.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(1) because, on information and belief, all defendants reside in Illinois, and at least one resides in this District. Venue is also proper under § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## BACKGROUND

**The Fame and Strength of the WALGREENS® Mark**

12.     Walgreens is one of the most recognized brands in America, particularly in the health and wellness market.

13.     Walgreens's history goes back to 1901, with a single corner drug store in the South Side of Chicago. At first slowly, and then more quickly, Walgreens locations bloomed

3

during the 20th century, with the 100th Walgreens store opening in 1926, the 1000th opening in 1984, and the 3,000th opening in year 2000.

14.     Today, Walgreens has approximately 8,600 store locations throughout the United States, including approximately 550 locations in Illinois, together with an active online storefront serving the entire United States.

15.     Walgreens fills millions of prescriptions in the United States every day. Walgreens also provides Americans with convenient in-person and online access to products relating to health and wellness, including medicines and treatments for a wide array of illnesses and ailments, personal protective equipment (PPE), hand sanitizer, and durable medical equipment like compression socks, shoe orthotics, cast and wound protectors, supports and braces, canes and crutches, walkers and rollators, scooters, lift chairs, wheelchairs and transport chairs, and mobility equipment accessories.

16.     Apart from pharmacy services and health and wellness products, Walgreens is well known for, among other things, vaccines and testing services; health information and advice; in-store health clinics; connecting patients with outside providers; and convenient access to cosmetics, toiletries, household items, food items, beverages, greeting cards, gift wrap, and photofinishing services.

17.     Walgreens has been a trusted mainstay in American health, and life, for many decades. For much of the country, the Walgreens corner store is a fixture of the local landscape as much as the community diner, library, or grocery.

18.     The consumer trust and loyalty Walgreens enjoys begins with the Company's high quality standards. Walgreens invests substantial resources evaluating its vendors and

products for compliance with applicable laws and regulations and the Company's own elevated standards.

19.    Walgreens is also famous for its record of innovation in pursuit of an enhanced customer experience. Walgreens was at the forefront of, among other things, modern store design; the use of self-service stores; the use of child-resistant medicine containers; the use of intercom computers; the creation of drive-thru pharmacies; offering prescription labels in multiple languages; the creation of the online pharmacy and the electronic prescription; and even, going back to the days of the Walgreens soda fountain, the invention of the malted milkshake. Walgreens has maintained this creative spirit, winning the 2023 Gold Stevie Award for Most Innovative Company of the Year, and being chosen by Fast Company Magazine as one of the healthcare industry's most innovative companies three of the past four years.

20.    Walgreens's strong reputation also owes to its philanthropic initiatives, including its efforts to uplift the health and wellbeing of the communities it serves, its staunch support in the international fight against cancer, and its passionate efforts to encourage blood donations, to provide medicine and supplies to communities struck by natural disasters, and to help end the cycle of childhood poverty, among other charitable causes.

21.    Relatedly, Walgreens is admired for having stepped up throughout its history during times of national crisis. Most recently, during the height of the Covid-19 Pandemic, Walgreens was one of the most visible companies in the country, being a leader in testing for, treating, and administering vaccines against Covid-19. In April 2021, to promote these efforts, Walgreens presented a primetime television special with celebrities, the sitting President of the Unites States and former U.S. presidents, doctors, and everyday people, to discuss the

importance of getting vaccinated. From 2020 to the present, Americans have received tens of millions of Covid-19 tests and vaccines at Walgreens.

22.     Additionally, Walgreens has benefited from a steadfast commitment to communicating with and informing the public regarding matters of health and wellness. In its efforts to serve and support its communities, Walgreens has long striven to provide the best available healthcare advice to its customers and their families. In more recent years, this has been achieved not only through in-store conversations, but through information posted on the Company's website and social media pages regarding a variety of generally useful health information and practical health tips, often through fun, colorful infographics.

23.     Walgreens's reputation for its commitment to quality products, to its customers, to the community, and to public health are all closely associated with the Company's name, *i.e.*, "Walgreens." Consumers and the public have well-formed expectations when they see the name "Walgreens," among the Company's most valuable trademarks.

24.     To protect the goodwill and reputation Walgreens has built over time, the Company owns, among other registered marks, U.S. Trademark Registration No. 2096551 (the "'551 mark"), registered September 16, 1997, for the typed word mark WALGREENS® for pharmacy and retail store services. The '551 mark further covers a lengthy list of health-related goods and services, including, among dozens of other categories, acne medications, allergy medicine, antiseptics and general purpose germicides, antibiotic cream, athlete's foot preparations, cream pain reliever, decongestant tablets, eye drops, lubricating jelly for medical purposes, nasal spray preparations, pain relievers, rubbing alcohol, skin lotions, skin moisturizers, heating pads and ice bags and thermometers for medical purposes, inner soles, and

hosiery. A true and correct printout from the USPTO website showing the current status and title for Registration No. 2096551 is attached here as Exhibit 1.

25.    The '551 Mark is valid and subsisting and incontestable under 15 U.S.C. § 1065. It is therefore conclusive evidence of Walgreens's rights to the WALGREENS® mark in commerce in connection with the goods and services specified in the Registration and in the natural zone of expansion of those goods and services.

26.    Additionally, as a result of the Company's extensive use and promotion of the WALGREENS® mark for more than a century, Walgreens has acquired substantial common law trademark rights covering the WALGREENS® word mark on a variety of health-related products and services.

27.    As Walgreens has used and promoted the WALGREENS® mark, it has made substantial investments to ensure the mark is associated with the highest quality goods and services, as well as the Company's other values, including innovation, philanthropy, and national and local service. To publicize its commitment to these values, Walgreens spends substantial sums on promotion and advertising each year across digital, print, television, and social media outlets.

28.    Walgreens has also specifically used the WALGREENS® mark in connection with health services, including in phrases such as "Walgreens Health" or "Walgreens Health Services." For example, Walgreens owns the website walgreenshealth.com, which was first registered in 1999. A visitor to that website in March 2005, for example, would arrive at a landing page with the text, "Welcome to Walgreens Health Services," as shown below:



29.  More recently, Walgreens launched "Walgreens Health" as a new business segment in 2021. The new business segment is a technology-enabled care model powered by a nationally scaled, locally delivered healthcare platform. As the press release announcing the new business segment explained, the Company's strategy "leverages an ecosystem including our trusted brands, exceptional assets, healthcare expertise and scale, integrated with a range of new talent, capabilities, resources and an intensified focus on operational excellence to drive long-term sustainable profit growth." Among the "trusted brands" driving the Company's success is, of course, the "Walgreens" brand itself, reflected in the registered WALGREENS® mark.

30.  As a result of Walgreens's extraordinary success and trusted role in American communities over more than 120 years, together with its efforts to publicize its story and values, the WALGREENS® mark represents tremendous goodwill and has achieved great fame and reputation in the United States as synonymous with trustworthy health products and services.

31.  Walgreens has the right to protect the goodwill and reputation associated with its WALGREENS® mark that it has built over decades.

32.     Walgreens has been vigilant in defending its trademark rights.

**Walgreen Health Solutions, LLC and Charles R. Walgreen**

33.     On information and belief, Defendant Walgreen Health Solutions is a company based in Evanston, Illinois, that sells durable medical equipment and other healthcare products and offers some healthcare and clinical information.

34.     Despite its confusingly similar name, "Walgreen Health Solutions" is not and never has been affiliated with Walgreens.

35.     On information and belief, Walgreen Health Solutions offers its goods and services at its main website <walgreenhealthsolutions.com>, as well as at <walgreenhealthsolutionsproducts.com> and the Amazon Marketplace, and promotes those goods and services through social media pages with account names such as "Walgreen Health Solutions" on Facebook and @WalgreenHealth on X (formerly Twitter).

36.     The company logo displayed on the two Walgreen Health Solutions websites places special emphasis on the word "Walgreen," set off in different color, shape, and font from the descriptive "Health Solutions":



37.     Elsewhere, including on LinkedIn, YouTube, Facebook, and X, Walgreen Health Solutions primarily uses a "Walgreen"-only logo:



38.     Though Walgreen Health Solutions's Amazon Marketplace page does not contain a logo, each product listing identifies the seller in typed characters as "Walgreen Health Solutions."

39.     On information and belief, Walgreen Health Solutions was formed in 2018 but did not begin conducting business until either 2019 or 2020. On further information and belief, Walgreen Health Solutions is the successor-in-interest to DM Solutions Inc., a health and medical goods business that operated from 1979 to 2019, including sometimes under the name Position Health.

40.     A "Capability Statement" on Walgreen Health Solutions's main website states that the company's products "include, but are not limited to," "compression hose and stockinette," "suspension padding," "[b]ody positioning," "[p]ressure detection," "[o]rthopedics," "[r]ehab therapy," "[b]ody protectors," and "Personal Protective Equipment (PPE)."

41.     At the time of the filing of this Complaint, the products Walgreen Health Solutions offers on its website included lotions for dry, chafed, or irritated skin, cushioned boots to remove heel pressure, tension straps for ankle injuries, medical compression stockings, and elbow suspension pads.

42.     On information and belief, Walgreen Health Solutions periodically updates its offerings with different health products. For example, in the recent past, Walgreen Health Solutions offered the following "Walgreen"-branded hand sanitizer and masks:



43.    The company's website further states that it "is dedicated to cutting edge, innovative, easy-to-use-cost-effective solutions for a multitude of health conditions." It boasts of the company's "Mission to Healthcare Innovations," telling users that Walgreen Health Solutions has "developed cutting edge, easy-to-use, integrated, and cost-effective solutions that are being used across the continuum of care throughout the world!"

44.    Walgreen Health Solutions targets its products to both healthcare providers and retail consumers, with its site's "Who We Serve" page listing "Patients, Caregivers, Healthcare Professionals and Medical Professionals." Without any special authorization or designation, any individual can order Walgreen Health Solutions's products directly through the company's websites or Amazon Marketplace store.

45.    On its social media accounts, Walgreen Health Solutions places posts containing general health advice for individuals next to posts promoting its products. For example, on August 18, 2023, @WalgreenHealth posted "Back-To-School" Safety Tips, including "Get Vaccinated," "Wash your hands frequently," and "Disinfect Surfaces Frequently":



46.     Walgreen Health Solutions has posted online about vaccines on other occasions as well. For example, on March 5, 2021, its social media accounts posted a one-minute video by Walgreen Health Solutions's Chief Medical Officer, Dr. Sakeena I. Haq, containing "tips to make sure you stay healthy after receiving [the] Covid-19 vaccine."

47.     For years – long before Walgreen Health Solutions was established – Walgreens has been selling durable medical equipment in-person and online, including, among many other products, sleeves, supports, and stabilizers for ankles and feet, and orthotic foot support with adjustable compression. Walgreens also has long sold a wide variety of personal protective equipment and medicated lotions and creams.

48.     There is no material difference in sight, sound, or meaning between "Walgreen" and WALGREENS®. Indeed, the Walgreens corporate name is "Walgreen Co.," it has used variations of "Walgreen Co.," "Walgreen's," and "Walgreens" at different times in its more than 120-year history, and consumers searching for products and services in the health and wellness space would naturally understand "Walgreen" or "Walgreens" branding to be associated with

Walgreens. Walgreen Health Solutions, both through the mark "Walgreen" and "Walgreen Health Solutions," has therefore created marketplace confusion given the strength and fame of the WALGREENS® mark and the identical, similar, and/or related products and services offered by Walgreen Heath Solutions and Walgreens.

49.     The confusion is further evidenced (and exacerbated) by the nature, content, and styling of certain of Walgreen Health Solutions's social media posts and other aspects of its online presence.

50.     The actual confusion between "Walgreen Health Solutions" and WALGREENS® is revealed in part on social media. For example, in response to a Facebook post by Walgreen Health Solutions discussing Dr. Haq and her medical practice, a Walgreens customer commented, "My Walgreens pharmacists are great!!! They answer all questions I have!!! Don't know what I'd do without them!!!," as shown in the screenshot below:



51.     Additionally, on the social media platform X, a user recently posted that they knew someone in need of delivery of the Covid-19 treatment Paxlovid – which Walgreens delivers for free through an initiative launched in late 2022 – asking "Could @WalgreenHealth [the X username for Walgreen Health Solutions] help out?" Several other public posts by users on X similarly reflect consumer confusion between "Walgreen Health Solutions" and WALGREENS®.

52.     The confusion Walgreen Health Solutions has created harms consumers, diminishing Walgreens's hard-earned brand equity and the capacity of the WALGREENS® mark to uniquely identify the company customers have known and trusted for generations.

14

**Charles R. Walgreen and the 2013 Agreement**

53.     On information and belief, Defendant Charles R. Walgreen is the President and CEO of Walgreen Health Solutions, as well as an owner of the company. Mr. Walgreen, who worked at Walgreens for more than two decades, is the great grandson of the founder of Walgreens and the son of one of Walgreens's former CEOs.

54.     On information and belief, Mr. Walgreen or others working at his direction formed Walgreen Health Solutions and arranged for the registration of the company's website domains.

55.     On information and belief, Mr. Walgreen selected and/or approved the "Walgreen Health Solutions" name to intentionally confuse consumers into believing the company was connected or associated with Walgreens.

56.     This was not the first time Mr. Walgreen and/or a company with which he was affiliated endeavored to trade on confusing consumers into thinking that non-Walgreens products or services came from Walgreens.

57.     In 2012, two companies affiliated with Mr. Walgreen, American Health and Wellness, LLC d/b/a iWag, and Walgreen Asset Group, Inc. ("Walgreen Asset Group"), created "iWag" phone cases and protectors with marks confusingly similar to those of registered Walgreens marks:





58.     Additionally, without any consent or license from Walgreens, the "Contact" section of the Walgreen Asset Group website linked to the Walgreens Twitter feed, Walgreens Facebook feed, and a Walgreens television commercial.

59.     Mr. Walgreen has testified that the "iWag" logo was specifically designed to look like Walgreens's logo. He has also testified that his company was named Walgreen Asset Group, with the nickname and acronym "Wag," since "Wag" was Walgreens's stock ticker symbol and it reminded him of his family's involvement with Walgreens.

60.     During a May 2013 discussion with Walgreens, Mr. Walgreen stated that he viewed the iWag products as a business opportunity for Walgreens, but that if Walgreens decided not to purchase and/or distribute the products, Mr. Walgreen would "reserve[] the right to sell the iWag products direct to consumers via Web and other retail channels, or in the international markets."

61.     Walgreens viewed iWag and Walgreen Asset Group's actions, by and through Mr. Walgreen, as blatant violations of its trademark rights. However, in the interest of avoiding litigation and reaching an amicable resolution of the dispute, Walgreens negotiated with Mr. Walgreen, eventually agreeing to purchase remaining iWag inventory in return for assurances that neither Mr. Walgreen's companies, nor Mr. Walgreen himself, would infringe Walgreens's trademarks again (the "2013 Agreement," attached as Exhibit 2).

62.     Given Mr. Walgreen's efforts to sell products that infringed Walgreens's trademark rights, it was critical to the resolution of the parties' disputes that Mr. Walgreen sign the 2013 Agreement not just in a representative capacity but also in his personal capacity, promising that he would not, either as an individual or on behalf of any other company, repeat the iWag experience by creating another business that might be confused with Walgreen Co.

17

Although Mr. Walgreen originally resisted a draft agreement that had a separate signature line for him on his own behalf, he acquiesced after Walgreens explained the importance of the provision and separate obligation.

63.     Accordingly, the 2013 Agreement created certain requirements that iWag and Walgreen Asset Group's officers and agents would need to meet, while further providing that Mr. Walgreen would also need to meet those requirements when acting as an individual or on behalf of any other entity.

64.     One such requirement Mr. Walgreen needed to meet while acting on behalf of other entities was to take reasonable precautions to ensure that those entities are not confused with Walgreens. This was the heart of the parties' agreement: Walgreens was willing to buy the iWag inventory (which had minimal value to Walgreens otherwise) in exchange for an enforceable promise that it would not be in the same situation again, with Mr. Walgreen creating a business with a confusingly similar name to Walgreens. Accordingly, the parties mutually understood—as reflected in the written contract itself, as well as the negotiation history—that Mr. Walgreen undertook this obligation personally, and that it prohibited him from starting any new business in which he failed to take reasonable precautions to ensure that new business was not confused with Walgreens.

65.     More specifically, Paragraph 4 of the 2013 Agreement expressly bound the "Companies" and their "officers and agents" to "take reasonable precautions to insure their businesses are not confused with Walgreen Co." This provision therefore required that Mr. Walgreen, as an officer and agent of iWag and Walgreen Asset Group, avoid confusion between the two Companies and Walgreens. Separately, the parties agreed (following negotiations on the specific issue) to have Mr. Walgreen sign the agreement a second time, in his individual

18

capacity, warranting that he would not take actions in conflict with the obligations of the Companies, including those obligations in Paragraph 4.

66.     The mutually understood purpose of the provision accompanying Mr. Walgreen's individual signature was to extend Paragraph 4's "no confusion" provision—which already covered Mr. Walgreen's conduct with respect to the Companies—so that Mr. Walgreen would commit to avoiding confusion with Walgreens with *any* future businesses he might create or become associated with.

67.     To the extent that these contractual provisions binding Mr. Walgreen's individual conduct are unclear, it was mutually understood, as reflected in the negotiation history of the 2013 Agreement—which does not have an integration clause—that Mr. Walgreen had bound himself to taking reasonable precautions to ensure that his businesses are not confused with Walgreen Co.

68.     Through the use of "Walgreen Health Solutions," which is confusingly similar to WALGREENS®, Mr. Walgreen has violated his obligation under the identified provisions, and the parties' mutual understanding as reflected in the negotiation history of the Agreement.

69.     It is plain that "Walgreen Health Solutions" is nothing more than another variation on the theme of his prior entities "Walgreen Asset Group" and "iWag" that precipitated the 2013 Agreement and resulted in Mr. Walgreen's personal agreement *not* to do this again. Yet he has.

70.     Mr. Walgreen's last name does not entitle him to infringe or dilute Walgreens's valid, protectable trademarks by using confusingly similar marks in connection with identical or similar goods or services offered by Walgreens.

71.     Shortly after learning about and then investigating Walgreen Health Solutions, Walgreens, through its outside counsel, sent a letter to counsel for Walgreen Health Solutions on or around March 2, 2022. In the letter, Walgreens stated that it viewed Walgreen Health Solutions's and Mr. Walgreen's actions as trademark infringement, a violation of the 2013 Agreement, and more. Walgreens also expressed its hope that the matter could be resolved amicably.

72.     Since then, Walgreens has worked extensively to try to resolve the dispute short of litigation. In a series of calls, letters, and emails from March 2022 through the present, Walgreens reiterated to Walgreen Health Solutions and Mr. Walgreen that it objected to their registration or use of "Walgreen Health Solutions" in connection with offering health related products or services, since it was likely to confuse the public and relevant market as to the source or origin of those products or services, and directly violated the terms of the 2013 Agreement. Despite Walgreens's good faith desire and efforts to resolve the dispute without litigation, the sides were unable to engage in productive negotiations.

73.     Walgreen Health Solutions and Mr. Walgreen continue to intentionally trade on Walgreens's goodwill, equity, and fame without Walgreens's license or consent.

**FIRST CLAIM FOR RELIEF**
**Federal Trademark Infringement (15 U.S.C. § 1114) against Walgreen Health Solutions**

74.     Walgreens incorporates each of the preceding paragraphs as if fully set forth herein.

75.     Walgreens possesses valid and enforceable rights in the WALGREENS® mark in connection with all of the goods and services at issue in this case given its extensive use, registration, promotion, and advertisement of the WALGREENS® mark, and has possessed such rights at all relevant times.

20

76.     Walgreen Health Solutions's use in commerce of marks that are confusingly similar to the WALGREENS® mark is likely to cause confusion and create a false and misleading impression about Walgreens's affiliation, connection, or association with Walgreen Health Solutions and/or the goods it sells.

77.     Walgreen Health Solutions's conduct is willful, deliberate, in bad faith, and undertaken with knowledge of Walgreens's prior rights, and with full knowledge that Walgreen Health Solutions has no right, license, or authority to use the WALGREENS® mark or any confusingly similar variant, including "Walgreen" or "Walgreen Health Solutions."

78.     Walgreen Health Solutions's actions are intended to exploit the goodwill that Walgreens has built up in its WALGREENS® mark.

79.     Walgreens has been, and will continue to be, irreparably injured and damaged by Walgreen Health Solutions's conduct as described above. Unless the Court enjoins such conduct, Walgreens will suffer further harm to its registered trademark, business reputation, and goodwill. Walgreens has no adequate remedy at law.

**SECOND CLAIM FOR RELIEF**
**Federal Trademark Dilution (15 U.S.C. § 1125(c)) Against Walgreen Health Solutions**

80.     Walgreens incorporates each of the preceding paragraphs as if fully set forth herein.

81.     Walgreens possesses valid and enforceable rights in the WALGREENS® mark in connection with all of the goods and services at issue in this case given its extensive use, registration, promotion, and advertisement of the WALGREENS® mark, and has possessed such rights at all relevant times.

82.     Given its extensive use, registration, advertising, promotion, and consumer and market recognition, the WALGREENS® mark is famous and distinctive, and is entitled to protection against likely dilution.

83.     The WALGREENS® mark became famous and distinctive long before Walgreen Health Solutions was formed or began any business activities.

84.     Walgreen Health Solutions's actions described herein are likely to dilute the distinctive quality of the WALGREENS® mark.

85.     Walgreen Health Solutions's conduct is deliberate, in bad faith, and undertaken with knowledge of Walgreens's prior rights, and with full knowledge that Walgreen Health Solutions has no right, license, or authority to use the WALGREENS® mark or any confusingly similar variant, including "Walgreen" or "Walgreen Health Solutions."

86.     Walgreen Health Solutions's actions are intended to exploit the goodwill that Walgreens has built up in its WALGREENS® mark.

87.     Walgreens has been, and will continue to be, irreparably injured and damaged by Walgreen Health Solutions's conduct as described above. Unless the Court enjoins such conduct, Walgreens will suffer further harm to its registered trademark, business reputation, and goodwill. Walgreens has no adequate remedy at law.

### THIRD CLAIM FOR RELIEF
### False Designation of Origin and/or False Representation (15 U.S.C. § 1125(a)) Against Walgreen Health Solutions

88.     Walgreens incorporates each of the preceding paragraphs as if fully set forth herein.

89.     Walgreens possesses valid and enforceable rights in the WALGREENS® mark in connection with all of the goods and services at issue in this case given its extensive use,

22

registration, promotion, and advertisement of the WALGREENS® mark, and has possessed such rights at all relevant times.

90. Walgreen Health Solutions's unauthorized use of the "Walgreen" and "Walgreen Health Solutions" marks, confusingly similar to WALGREENS®, constitutes a false or misleading representation of fact, which is likely to cause confusion or mistake, or to deceive as to the affiliation, connection, or association among and between the parties and their respective goods and services, or confusion or mistake as to the origin, sponsorship, or approval among and between the parties and their respective goods and services.

91. Walgreen Health Solutions's conduct is willful, deliberate, in bad faith, and undertaken with knowledge of Walgreens's prior rights, and with full knowledge that Walgreen Health Solutions has no right, license, or authority to use the WALGREENS® mark or any confusingly similar variant, including "Walgreen" or "Walgreen Health Solutions."

92. Walgreen Health Solutions's actions are intended to exploit the goodwill that Walgreens has built up in its WALGREENS® mark.

93. Walgreens has been, and will continue to be, irreparably injured and damaged by Walgreen Health Solutions's conduct as described above. Unless the Court enjoins such conduct, Walgreens will suffer further harm to its registered trademark, business reputation, and goodwill. Walgreens has no adequate remedy at law.

**FOURTH CLAIM FOR RELIEF**
**Trademark Infringement Under Illinois Law (765 ILCS 1036/60) Against Walgreen Health Solutions**

94. Walgreens incorporates each of the preceding paragraphs as if fully set forth herein.

95. Walgreens possesses valid and enforceable rights in the WALGREENS® mark in connection with all of the goods and services at issue in this case given its extensive use,

registration, promotion, and advertisement of the WALGREENS® mark, and has possessed such rights at all relevant times.

96. Walgreen Health Solutions's use in commerce of marks that are similar to the WALGREENS® mark is likely to cause confusion and create a false and misleading impression about Walgreens's affiliation, connection, or association with Walgreen Health Solutions and/or the goods it sells.

97. Walgreen Health Solutions's conduct is willful, deliberate, in bad faith, and undertaken with knowledge of Walgreens's prior rights, and with full knowledge that Walgreen Health Solutions has no right, license, or authority to use the WALGREENS® mark or any confusingly similar variant, including "Walgreen" or "Walgreen Health Solutions."

98. Walgreen Health Solutions's actions are intended to exploit the goodwill that Walgreens has built up in its WALGREENS® mark.

99. Walgreens has been, and will continue to be, irreparably injured and damaged by Walgreen Health Solutions's conduct as described above. Unless the Court enjoins such conduct, Walgreens will suffer further harm to its registered trademark, business reputation, and goodwill. Walgreens has no adequate remedy at law.

**FIFTH CLAIM FOR RELIEF**
**Violation of Illinois Uniform Deceptive Trade Practices Act (815 ILCS 510)**

100. Walgreens incorporates each of the preceding paragraphs as if fully set forth herein.

101. Walgreens possesses valid and enforceable rights in the WALGREENS® mark in connection with all of the goods and services at issue in this case given its extensive use, registration, promotion, and advertisement of the WALGREENS® mark, and has possessed such rights at all relevant times.

102.     Walgreen Health Solutions's use in commerce of marks that are confusingly similar to the WALGREENS® mark is likely to cause confusion and create a false and misleading impression about Walgreens's affiliation, connection, or association with Walgreen Health Solutions and/or the goods it sells.

103.     Walgreen Health Solutions's conduct is willful, deliberate, in bad faith, and undertaken with knowledge of Walgreens's prior rights, and with full knowledge that Walgreen Health Solutions has no right, license, or authority to use the WALGREENS® mark or any confusingly similar variant, including "Walgreen" or "Walgreen Health Solutions."

104.     Walgreen Health Solutions's actions are intended to exploit the goodwill that Walgreens has built up in its WALGREENS® mark.

105.     Walgreens has been, and will continue to be, irreparably injured and damaged by Walgreen Health Solutions's conduct as described above. Unless the Court enjoins such conduct, Walgreens will suffer further harm to its registered trademark, business reputation, and goodwill. Walgreens has no adequate remedy at law.

**SIXTH CLAIM FOR RELIEF**
**Common Law Unfair Competition Against Walgreen Health Solutions and Charles R. Walgreen**

106.     Walgreens incorporates each of the preceding paragraphs as if fully set forth herein.

107.     Walgreens possesses valid and enforceable rights in the WALGREENS® mark in connection with all of the goods and services at issue in this case given its extensive use, registration, promotion, and advertisement of the WALGREENS® mark, and has possessed such rights at all relevant times.

108.     Mr. Walgreen and Walgreen Health Solutions deliberately infringed on the WALGREENS® mark by intentionally using marks that are confusingly similar in order to

cause confusion and create a false and misleading impression about Walgreens's affiliation, connection, or association with Walgreen Health Solutions and/or the goods it sells.

109.    In doing so, Mr. Walgreen and Walgreen Health Solutions took actions in a market for health and wellness products in which Walgreens also operates that allowed Mr. Walgreen and Walgreen Health Solutions to gain an unfair advantage.

110.    Walgreens has been damaged by Mr. Walgreen and Walgreen Health Solutions's conduct as described above.

**SEVENTH CLAIM FOR RELIEF**
**Breach of Contract Against Charles R. Walgreen**

111.    Walgreens incorporates each of the preceding paragraphs as if fully set forth herein.

112.    The 2013 Agreement between Walgreens and Mr. Walgreen is a valid and enforceable contract.

113.    Walgreens fulfilled its obligations under the 2013 Agreement, including by purchasing the remaining inventory of one of Mr. Walgreen's companies.

114.    By forming Walgreen Health Solutions, registering <walgreenhealthsolutions.com> and <walgreenhealthsolutionsproducts.com>, and operating a company that routinely uses marks that are confusingly similar to WALGREENS® as described above, Mr. Walgreen breached his obligations under the 2013 Agreement.

115.    Mr. Walgreen's breach has caused injury to Walgreens.

**JURY DEMAND**

116.    Pursuant to Federal Rule of Civil Procedure 38(b), Walgreens demands a trial by jury.

## **PRAYER FOR RELIEF**

Walgreens prays for the following relief:

1.       Judgment in favor of Walgreens on all counts.

2.       Preliminary and permanent injunctive relief restraining Mr. Walgreen, Walgreen Health Solutions, and Walgreen Health Solutions's officers, agents, servants, employees, and attorneys, and all persons in active concert and/or participation with any of them:

        a.       From in any way using, displaying, advertising, copying, diluting, imitating, or infringing upon, the WALGREENS® mark, including by using the "Walgreen" or "Walgreen Health Solutions" marks or any other marks that are confusingly similar to the WALGREENS® mark;

        b.       From otherwise unfairly competing with Walgreens;

3.       Judgment that Walgreen Health Solutions be directed to deliver to the Court for destruction, pursuant to 15 U.S.C. § 1118, all labels, signs, packaging, prints, promotional materials, tapes, discs or other articles in its possession bearing the "Walgreen" or "Walgreen Health Solutions" marks, and all websites, plates, molds, matrices, screens or other means of making or promoting the same.

4.       Compensatory and exemplary damages, as well as disgorgement of Defendants' profits.

5.       Pre- and post-judgment interest, and attorney's fees and costs.

6.       All other and further relief as is just, equitable, and proper.

Dated:  October 22, 2024                    Respectfully submitted,

By: */s/ Kristen R. Seeger*

Kristen R. Seeger (ARDC No. 6278416)
Steven J. Horowitz (ARDC No. 6307861)
Maseeh Moradi (ARDC No. 6330166)
D. Samuel Gorsche (ARDC No. 6339041)
**SIDLEY AUSTIN LLP**
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000
kseeger@sidley.com
shorowitz@sidley.com
mmoradi@sidley.com
sgorsche@sidley.com

*Counsel for Plaintiff*
*Walgreen Co.*